UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

MARIA PICARD                              CIVIL ACTION

VERSUS                                    NO: 08-824

ST. TAMMANY PARISH HOSPITAL               SECTION: R

## ORDER AND REASONS

Before the Court is defendant St. Tammany Parish Hospital's
motion for summary judgment. For the following reasons, the
court GRANTS the motion in part and DENIES it in part.


**I.    BACKGROUND**

Plaintiff Maria Picard alleges in this action that her
former employer, defendant St. Tammany Parish Hospital,
discriminated against her and retaliated against her in violation
of the Americans with Disabilities Act. Picard suffers from
Charcot-Marie-Tooth disease (CMT), a degenerative neuromuscular
disease similar to muscular dystrophy. She was employed by the
Hospital as a transcriptionist from July 20, 1998 until November
24, 2006. Picard first notified the Hospital of her condition in
2000 though a letter from her physician, Dr. Palopoli. *See*

-1-

Palopoli Letter, R. Doc. 39-4 at 36.[1] Dr. Palopoli explained

that Picard had CMT and carpal tunnel syndrome, which "cause

sensory deficits of her finger tips which affect both the speed

and accuracy of her typing." *Id.* He recommended that the

Hospital allow Picard to take a ten minute break for every hour

of work. The record does not indicate what action the Hospital

took in response to the letter.

In August of 2004, Picard took leave under the Family

Medical Leave Act in order to undergo surgery for her carpal

tunnel syndrome. While she was on leave, she met with her

supervisor, Sancy Hooge, and asked for permission to use Dragon

Naturally Speaking, a brand of voice recognition software, at

work.[2] Picard was worried that her CMT and carpal tunnel surgery

were affecting her work productivity in a way that could

jeopardize her job security.[3] She believed that the Dragon

---

[1] Except with respect to Picard's deposition, all of record
citations refer to the CM/ECF document and page number rather
than the original page number.

[2] As the Court understands it, the Dragon software converts
spoken words into written text. The user speaks into a headset
or microphone, and the software recognizes the words and
transcribes them into a word processing document. Apparently,
Picard imagined that she would listen to the physicians'
dictation on a headset and repeat what they said in a slower,
clearer voice for the Dragon software.

[3] She claims that the pressure to perform increased
substantially as her condition deteriorated. *See, e.g.*, Picard
Depo., R. Doc. 47 at 163 ("Natalie [Allain, the head of the
Hospital's Health Information Management Department,] said that
when I got to the point where I was unable to keep up with the

software would compensate for her typing deficiencies by allowing her to transcribe without relying on her limited fine motor skills. Because voice recognition software can be thrown off by background noise and could pose a distraction in a room with other transcriptionists, Picard also suggested that "she would need a quiet place or to work on nights and weekends to utilize the software." Hooge Aff., R. Doc. 34-9 at 2.

On September 29, 2004, Hooge sent an e-mail to Natalie Allain, head of the Hospital's Health Information Management Department, explaining Picard's request. R. Doc. 39-7 at 63. Allain instructed Hooge to set up a meeting with Michelle Chaix, a human resources officer at the Hospital, and two Hospital technology staff members in order to "talk through this issue since it is a first for us." Chaix, who was carbon copied on the e-mail, responded:

> WHOA!!!! Before a meeting is scheduled we need something from her physician that indicates that she cannot perform the essential functions of her position due to this medical problem and that an accommodation is recommended in order for her to continue in her current capacity. We need to be real careful about classifying this as a disability until the above is provided.

R. Doc. 39-7 at 62.

Two months later, after Picard had returned to work, Allain sent Chaix a follow-up e-mail saying that the documentation from Picard's physician "indicates that there are no restrictions for

_____

productivity, I was out of there.").

her to perform her essential functions." *Id.* The referenced
documentation is apparently Picard's "Return to Work Evaluation,"
a Hospital-provided form completed by Picard's carpal tunnel
surgeon, which indicates that Picard had "no restrictions" with
respect to bending, walking/standing, sitting, lifting, carrying,
pushing/pulling, reaching, and performing repetitive actions.  R.
Doc. 39-4 at 39.

On January 4, 2005, Allain met with Picard to inform her
that the Hospital had determined that her request to use the
Dragon software would be denied.  Allain initially justified the
decision in terms of the post-surgery release.  Picard then
explained "that the request was not related to her carpal tunnel
surgery, but to her Charcot-Marie-Tooth disease."  Allain Aff.,
R. Doc. 34-10 at 2.  Allain recorded her impression of the
meeting in a memorandum to the file:

> I reported to Maria that I discussed her request with Human
> Resources.  I informed her that we have documentation that
> she was released to full duty without restrictions.
> Therefore, we were unable to consider her request for
> special accommodations.
>
> Maria responded that if we needed, she could get Dr. Fisher
> to give us medical documentation as to her disability.  If
> the release to full duty was related to the carpal tunnel,
> then this is not the reason she is requesting special
> accommodations.  It was because of her other progressive
> diseases she claims is keeping her from producing her line
> count.  She listed several diseases, including, Charcot-
> Marie-Tooth, Dyslexia, concentration problems, nerve ending
> problems, and sometimes neck and shoulder pain.  She
> indicated that sometimes she misspells words in the reports
> because her fingers are not hitting the keys that the brain
> wants them to hit.  She states that it is like a disconnect

-4-

between her brain and her fingers. She feels the carpal tunnel really did not help her.

I suggested that she join a support group with other individuals having the same diseases and find out what is the best career for them. We also told Maria that we would be getting Dictaphone Voice Recognition [a different voice recognition software program] within the year and that it may help her while editing.

Allain Memo, R. Doc. 34-10 at 3.

On March 5, 2005, Picard provided a letter from her physician explaining that she "suffers from Marie-Charcot-Tooth disease." Fischer Letter, R. Doc. 39-4 at 42. The physician noted that Picard's condition "causes a delay in nerve impulse propagation and manifests this [as] impaired sensation and impaired motor activity." *Id.* After further pointing out that the condition can impair an individual's ability to perform "tasks requiring manual dexterity such as typing," he concluded that "[i]t is my opinion that this does represent a significant handicap for the patient in her current profession and should be taken into account in any measures of her job performance." *Id.*

In August of 2005, nearly one year after Picard first requested the Dragon software, the Hospital purchased Dictaphone ExSpeech software. The Dictaphone software was set up so that the physicians would dictate their notes and the software would transcribe the notes into an unformatted document. The transcriptionists would then format and edit the notes using a traditional keyboard. It apparently took several months to fully

implement Dictaphone, and the transcriptionists were not trained to use it until the beginning of February of 2006. Picard used Dictaphone briefly, but she switched back to typing after discovering that the most commonly used Dictaphone keystrokes were "too painful" for her because of her carpal tunnel surgery. Picard Depo., R. Doc. 47 at 139.

On February 22, 2006, another one of Picard's physicians sent a letter to the Hospital recommending that Picard be permitted to use the Dragon software. Plauche Letter, R. Doc. 39-4 at 43. On June 21, 2006, Picard met with Melanie Hunley, the new head of the Hospital's Health Information Management Department, to discuss her request to use the Dragon software. Several weeks later, Hunley sent an e-mail to Judy Gracia, the Hospital's Vice President for Human Resources, informing her of the meeting. After describing Picard's request for the Dragon software and noting that Picard had mentioned the Americans with Disabilities Act, Hunley added:

> Based on her history with the hospital, I would like to look into her request and make sure I am covering all my bases in terms of the hospital's response to references made. I wouldn't put anything past her.

R. Doc. 39-4 at 44. Gracia sent a number of questions in reply, but she ultimately did not resolve anything over e-mail. *Id.*

Hunley met with Michelle Chaix several days later, and the two reviewed the letters from Picard's physicians. According to Hunley, they concluded that, at that time, "the letters did not

-6-

indicate a medical necessity or certification of disability, and based on the fact that Mrs. Picard was meeting the required productivity guidelines as well ... we would not be filling her request at that time." Hunley Depo., R. Doc. 39-8 at 15-16. Hunley admitted that she never discussed with Picard how the letters were deficient. *Id.* at 20.

Picard resigned from her employment at the Hospital on November 25, 2006. In her resignation letter, she indicated that she had taken a position at a different medical center. In May of 2007, Picard filed a charge with the Equal Employment Opportunity Commission, alleging that the Hospital had unlawfully discriminated against her on the basis of disability. She was given a right-to-sue letter, and, on February 4, 2008, she filed a complaint in this Court. Picard alleges that the Hospital violated the Americans with Disabilities Act by failing to reasonably accommodate her disability and by retaliating against her for requesting an accommodation. She has also asserted a claim for defamation under Louisiana law.

The Hospital has now moved for summary judgment. It argues that Picard is not disabled under the ADA, that it reasonably accommodated her disability even though it was under no obligation to do so, that she was not retaliated against, and that she had presented no evidence in support of her defamation claim. The Court now rules as follows.

## II. LEGAL STANDARD

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagra Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The moving party bears the burden of establishing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325; *see also Lavespere*, 910 F.2d at 178. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See Celotex*, 477 U.S. at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish that a genuine issue exists for trial. *See id.* at 325;

*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1996).

## III. AMERICANS WITH DISABILITIES ACT

Title I of the Americans with Disabilities Act addresses disability-based discrimination in the employment context. Title I's main anti-discrimination provision prohibits covered employers from:

> discriminat[ing] against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms and conditions, and privileges of employment.

42 U.S.C. § 12112(a). A plaintiff asserting a Title I discrimination claim must establish that: (1) she is qualified for her position; (2) she has a disability; and (3) she was discriminated against because of her disability. *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007). Another of the ADA's provisions bars covered employers from retaliating against employees who engage in activities protected by the Act. 42 U.S.C. § 12203.

In its motion for summary judgment, the Hospital argues that Picard cannot show: (1) that she has a disability or (2) that the Hospital engaged in an unlawful practice. It does not dispute that it is a "covered entity" under the ADA nor does it dispute that Picard was qualified for her position.

## A.  Disability

As relevant here, the ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A).  A physical impairment may include "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 479-80 (1999), *superseded by statute*, ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008).[4]  Major life activities "are those activities that are of central importance to most people's everyday lives," *Jenkins*, 487 F.3d at 315, including, but not limited to, "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Mason v. United Air Lines, Inc.*, 274 F.3d 314, 317 (5th Cir. 2001) (quoting 29 C.F.R. § 1630.2(i)).  A major life activity will be considered "substantially limited" when the individual is:

> (i)  [u]nable to perform a major life activity that the average person in the general population can perform; or

---

[4]  The ADA was recently amended to overrule several Supreme Court cases and to broaden the Act's coverage, but the changes do not apply retroactively.  *See EEOC v. Agro Distribution, LLC*, 555 F.3d 462, 469 n.8 (5th Cir. 2009).  The statutory citations in this order refer to the pre-amendment version of the ADA.

> (ii) [s]ignificantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

*McInnis v. Alamo Cmty. Coll. Dist.*, 207 F.3d 276, 280 (5th Cir. 2000) (quoting 29 C.F.R. § 1630.2(j)).  In determining whether an impairment is substantially limiting, courts may consider the nature and severity of the impairment, the expected duration of the impairment, and the expected permanent or long term impact resulting from the impairment.  *EEOC v. Agro Distribution, LLC*, 555 F.3d 462, 470 (5th Cir. 2009).

Picard claims that she is disabled under the ADA because she suffers from a neurological disorder known as Charcot-Marie-Tooth disease (CMT).  The National Institute of Neurological Disorders and Stroke describes the typical symptoms of CMT as follows:

> A typical feature includes weakness of the foot and lower leg muscles, which may result in foot drop and a high-stepped gait with frequent tripping or falls.  Foot deformities, such as high arches and hammertoes (a condition in which the middle joint of a toe bends upwards) are also characteristic due to weakness of the small muscles in the feet. In addition, the lower legs may take on an "inverted champagne bottle" appearance due to the loss of muscle bulk. Later in the disease, weakness and muscle atrophy may occur in the hands, resulting in difficulty with fine motor skills.

Charcot-Marie-Tooth Disease Fact Sheet, Pub. No. 07-4897, National Institute of Neurological Disorders and Stroke, National Institutes of Health (April 2007), *available at*

http://www.ninds.nih.gov/disorders/charcot_marie_tooth/
detail_charcot_marie_tooth.htm.

Although a plaintiff's alleged disability must ultimately be evaluated within the context of its impact on that particular individual's life, *see Sutton*, 527 U.S. at 483, the Court begins its analysis by noting that the vast majority of federal courts to consider CMT have treated the disease as an ADA-covered disability. *See Patten v. Wal-Mart Stores East, Inc.*, 300 F.3d 21, 23 (1st Cir. 2002) (finding that CMT "substantially limits [the plaintiff's] ability to walk or stand for a long time" and treating CMT as a covered disability), *aff'g*, *Patten v. Wal-Mart Stores East, Inc.*, 2001 WL 631258 at *5 (D. Me. 2001) (finding that plaintiff with CMT had established genuine issue of fact as to whether she was disabled); *Johnson v. State of Md.*, 113 F.3d 1232, 1997 WL 240823 at *1 (4th Cir. 1997) (per curiam) (table) (finding that plaintiff's CMT "qualifies as a disability under the ADA"), *aff'g*, *Johnson v. State of Md.*, 940 F. Supp. 873, 877 (D. Md. 1996) (finding that plaintiff with CMT had established genuine issue of fact as to whether he was disabled); *Childers v. County of York*, 2008 WL 552879 at *13 (D.S.C. 2008) (finding that there was a genuine issue of fact as to whether plaintiff with CMT was disabled); *French v. Providence Everett Medical Center*, 2008 WL 4186538 at *3 (W.D. Wash. 2008) ("Defendant concedes that plaintiff [with CMT] is a person with a disability under the

ADA."); *Giles v. Goodwill Industries of Acadiana, Inc.*, 2005 WL
1936340 at *2 (W.D. La. 2005) ("The parties agree that Giles, who
suffers from a form of muscular dystrophy called 'Charcot Marie
Tooth Disease,' is qualified as 'disabled' within the meaning of
the ADA."); *cf. Carmi v. Metropolitan St. Louis Sewer Dist.*, 471
F. Supp. 119, 121 (E.D. Mo. 1979) (finding that plaintiff with
CMT was a handicapped individual under an analogous provision of
the Rehabilitation Act), *aff'd*, 620 F.2d 672 (8th Cir. 1980).
*But see Bertinetti v. Joy Mining Machinery*, 231 F. Supp. 2d 828,
834 (S.D. Ill. 2002) (finding that plaintiff had not presented
sufficient evidence to enable jury to find that CMT substantially
limited his ability to walk).

The Hospital argues that Picard cannot show that her
impairment substantially limited her in the major life activity
of working because she is "not incapable of performing a broad
range of jobs." R. Doc. 34-12 at 7 (citing *Moreno v. Brownlee*,
85 Fed. Appx. 23, 27-28 (5th Cir. 2004) (per curiam)
(unpublished)). Instead of setting forth facts regarding her
ability to work, Picard counters that she is substantially
limited in several other major life activities: walking,
performing manual tasks, seeing, shopping, and grooming. R. Doc.
39-1 at 9. As noted above, the Fifth Circuit and the EEOC have
expressly recognized that walking, performing manual tasks, and
seeing are major life activities. *See Mason*, 274 F.3d at 317.

-13-

The Hospital does not argue otherwise.

The Court will focus on Picard's allegedly limited ability to perform manual tasks because that is the disability that gave rise to Picard's request for accommodations. *See Felix v. New York City Transit Authority*, 324 F.3d 102, 104 (2d Cir. 2003) (holding that there must be a "causal link between the specific condition which limits a major life activity and the accommodation required"). The major life activity of performing manual tasks presents unique analytical issues. Picard focuses heavily on her impaired ability to type when arguing that she is substantially impaired in the major life activity of performing manual tasks. But an inability to type, standing alone, is not sufficient to show that a plaintiff is disabled. As the Supreme Court has explained, "[w]hen addressing the major life activity of performing manual tasks, the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with her specific job." *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 200-01 (2002), *superseded by statute*, ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008). While the employee's ability to perform job-related manual tasks may bear on the overall inquiry, "the manual tasks unique to any particular job are not necessarily important parts of most people's lives." *Id.*

at 201.  As an example, the Supreme Court noted that a plaintiff's inability to perform the highly job-specific task of "repetitive work with hands and arms extended at or above shoulder levels for extended periods of time" was not relevant to the disability inquiry because it was not an important part of most people's daily lives.  *Id.*  In the age of computers, typing is undoubtedly important in many people's daily lives, and it is thus properly considered as part of the manual tasks inquiry. But Picard must point to additional manual activities that she has difficulty performing if she is to show that she is substantially impaired in the "variety of tasks central to most people's daily lives."  *Id.*

Picard relies primarily on her own testimony to support her argument that her ability to perform manual tasks is substantially limited:

Q:  In what other ways, if any, were you affected by the medical condition that you had or have?

A:  The Charcot-Marie-Tooth Symdrome?

Q:  Yeah.  Are you able to walk?

A:  I fall a lot.

...

Q:  You can see?

A:  I don't see very well.  My eyes are problematic.

...

Q:  You drive a car?

A:   I don't drive very often and I don't drive at night.

Q:   Did you drive here today?

A:   Yes, I did drive here.

...

Q:   How about your ability to perform the functions of daily living, do you shop for yourself?

A:   Sometimes when other people won't or can't, but I don't do it very well.  It's -- I need help.

Q:   Why do you need help shopping?

A:   Because it's hard for me to carry things.  I[t] takes me multiple trips to bring anything in, my groceries or whatever, and they have to be very, very light bags. Usually someone always helps me.  I usually don't go shopping by myself.

Q:   Who goes with you to shop?

A:   Either my daughter or my friend.  Sometimes they will go without me because it's hard for me to walk along the street.

Q:   Are you able to bathe yourself, take care of daily functions such as brushing your teeth and going to the bathroom, those sorts of things?

A:   Yes, but I have restrictions on some aspects.  I don't do the things the same way other people do them.

Q:   You are able to take care of those needs yourself?

A:   Yes.

Q:   Toileting and bathroom and shave and bathing, you can do all of those things, can't you?

A:   Yes.

Q:   How about housekeeping, do you do any housework?

A:   No.  And if I have to wash a few dishes, I do it in

short amounts and rest in between.

...

Q: Alright.  Any other types of jobs that you are not able
to perform as a result of the Charcot-Marie-Tooth
syndrome that you have?

A: Most jobs I can't.

Q: Well, what jobs can't you perform as a result of the
Charcot-Marie-Tooth syndrome?  You have talked about
your inability to type fast.  What else can't you do?

A: I can't do jobs that require anything with fine motor
skills or repetitive, like, say, telemarketing,
answering the phone over and over again.  I don't write
very well.  It's very difficult to write and painful to
write.

...

Q: Were you able to do the duties of [your next] job?

A: With some difficulty I did.

Q: Okay.  What was that difficulty that you experienced?

A: It was very physical because it was turning pages and
tearing the things apart.  That was hard.  Staples, I
ended up having to get an automatic stapler.

Picard Depo., R. Doc. 47 at 167-72.  She further described her

impairment in terms of her ability to type:

Q: What does [CMT] do in the way of impairing your ability
to type?

A: The messages from my fingers to my brain and back to my
fingers telling me to type were slowed.

Q: Okay, so you are slowed down, and does it also cause
more mistakes, affect your accuracy?

A: It can.

Q: Is the main problem just that it slows you down,

> though, as opposed to accuracy?
>
> A:  Well, you get slowed down because your accuracy is
>     sometimes off.

*Id.* at 44.

Finally, Picard has pointed to information contained in several letters from her physicians, which she originally submitted to the Hospital when she was seeking permission to use Dragon.  The most specific of the letters described Picard's impairment as follows:

> Ms. Maria Picard is a patient of mine who suffers from Charcot Marie Tooth disease.  As a result of this condition, her ability to perform her current job, *i.e.*, working as a transcriptionist, is impaired.  This condition causes a delay in nerve impulse propagation and manifests this [as] impaired sensation and impaired motor activity.  This combination can certainly impair one['s] ability to perform in a capacity that someone without this condition would be able to especially with tasks requiring manual dexterity such as typing.  It is my opinion that this does represent a significant handicap for the patient in her current profession and should be taken into account in any measures of her job performance.

Fischer Letter, R. Doc. 39-4 at 42; *see also* Palopoli Letter, R. Doc. 39-4 at 36 ("Both the CMT disease and the [carpal tunnel syndrome] cause sensory deficits of her finger tips which affect both the speed and accuracy of her typing."); Plauche Letter, R. Doc. 39-4 at 43 ("[Picard] is a dedicated employee, but has several medical problems which do limit her ability to type consistently.").

The Court holds that Picard's evidence is sufficient to permit a reasonable jury to find that she is substantially

limited in her ability to perform manual tasks.  Her testimony
indicated that she is significantly impaired in her ability to
perform "the variety of tasks central to most people's daily
lives."  *Toyota Motor*, 534 U.S. at 200.  Among other things,
Picard claims to have great difficulty holding heavy objects,
doing household chores, typing, writing, turning pages, tearing
pieces of paper, using a stapler, and doing "anything with fine
motor skills."  Her doctor noted that she has "impaired sensation
and impaired motor activity" and described her limitations as a
"significant handicap."  If a jury were to believe Picard's
testimony, it could reasonably conclude that these are
significant limitations in the "condition, manner, or duration"
under which Picard can perform manual tasks as compared to an
average person.  *McInnis*, 207 F.3d at 280.

    In addition, there is evidence that Picard's condition was
permanent and that her abilities are likely to deteriorate over
time.  *See, e.g.*, Picard Depo., R. Doc. 47 at 36.  The nature and
severity of the impairment, the expected duration of the
impairment, and the expected permanent or long term impact
resulting from the impairment all suggest that Picard's
limitation was substantial.  *Agro Distribution*, 555 F.3d at 470.
Although Picard also testified that she is able to perform
certain manual tasks, such as brushing her teeth and bathing, she
indicated that she does not "do the things the same way other

people do them," Picard Depo., R. Doc. 47 at 169, which suggests that she is restricted in the manner in which she performs those tasks. *See McInnis*, 207 F.3d at 280. The Hospital acknowledges this evidence, *see* R. Doc. 34-12 at 7 n.3; R. Doc. 43 at 4, but offers no argument in rebuttal except the unhelpful statement that "Plaintiff presents no evidence that any major life activity was substantially limited by her claimed disability." R. Doc. 43 at 5. In light of this evidence, the Court finds that a reasonable jury, after drawing all reasonable inferences in Picard's favor, could conclude that Picard was substantially limited in the major life activity of performing manual tasks. Summary judgment must therefore be denied on the issue of whether Picard is an individual with a disability within the meaning of the ADA.

### B. Unlawful Employment Practices

Picard alleges two separate types of unlawful employment practices in her complaint. First, she alleges that the Hospital discriminated against her by failing to reasonably accommodate her disability. Second, she alleges that the Hospital retaliated against her for requesting an accommodation. The Court will treat each of these theories in turn.

### i. Failure to Accommodate

The ADA imposes an affirmative duty on covered employers to reasonably accommodate the known physical and mental limitations of their disabled employees, and a failure to make such an accommodation is a prohibited form of discrimination. *See* 42 U.S.C. § 12112(a), (b)(5). There is some confusion in the parties' briefs as to the essential elements of a claim for failure to accommodate. The Hospital argues that summary judgment must be granted unless Picard can show that she was subject to some adverse employment action, pointing to cases that describe proof of an adverse employment action as an element of "an ADA claim." *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1092 (5th Cir. 1996). It further claims that Picard cannot point to an adverse employment action because she was never disciplined, demoted, or terminated. Picard's response is difficult to interpret, *see* R. Doc. 39-1 at 12-14, but she seems to argue that there was an adverse employment action because she was constructively terminated, *see id.* at 14. As discussed below, there is insufficient evidence to permit a reasonable jury to find that Picard was constructively discharged. Nevertheless, it does not necessarily follow that she is unable to maintain a claim based on the Hospital's failure to reasonably accommodate her disability.

Although the phrase "adverse employment action" permeates the employment discrimination case law, *see, e.g., Dupre v. Charter Behavioral Health Systems of Lafayette Inc.*, 242 F.3d 610, 613 (5th Cir. 2001); *Ivy v. Jones*, 192 F.3d 514, 516 (5th Cir. 1999), it does not appear in the text of the ADA or in any of the other principal non-discrimination statutes. The ADA provides that employers shall not "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The phrase "discriminate against a qualified individual on the basis of disability" is defined to include, *inter alia*, "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." *Id.* § 12112(b)(5)(a). Covered employers are thus under an affirmative duty to provide their disabled employees with reasonable accommodations "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

The phrase "adverse employment action" arose as a judicial gloss on the language in the ADA, and in Title VII of the Civil

Rights Act of 1964, referring to employment decisions and "other terms, conditions, and privileges of employment." *See Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 708-09 (5th Cir. 1997), *abrogated by Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006); *Minor v. Centocor, Inc.*, 457 F.3d 632, 634 (7th Cir. 2006). As the Supreme Court has emphasized, the non-discrimination statutes were not intended to be general civility codes. *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998). Rather, they prohibit only discrimination that "affects a term, condition, or privilege of employment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (internal quotation marks omitted). The phrase "adverse employment action" is thus used as a shorthand for the sort of discrimination that is egregious enough to affect a term or condition of employment. It "express[es] the idea ... that it is essential to distinguish between material differences and the many day-to-day travails and disappointments that, although frustrating, are not so central to the employment relation that they amount to discriminatory terms or conditions." *Minor*, 457 F.3d at 634.

Of course, courts have long held that the non-discrimination laws cover "more than 'terms' and 'conditions' in the narrow contractual sense" and are not limited to "economic" or "tangible" discrimination. *National R.R. Passenger Corp. v.*

*Morgan*, 536 U.S. 101, 115-16 (2002) (quoting *Faragher v. Boca Raton*, 524 U.S. 775, 786 (1998)).  Employees may maintain a claim for workplace harassment, for example, even if there has not been a tangible change in their employment status.  But a plaintiff alleging employment discrimination must always be able to point to something beyond mere different treatment.  For this reason, workplace harassment is actionable only "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (citations and internal quotation marks omitted).

As the text of the ADA indicates, the employer's duty to reasonably accommodate its employees' disabilities is subject to the same caveat: a failure to accommodate is only actionable if it affects the terms, conditions, or privileges of employment.  *See* 42 U.S.C. § 12112(a).  Indeed, the EEOC regulations have codified this understanding in the definition of "reasonable accommodation."  The term is defined to include, *inter alia*, (1) modifications that enable the employee to perform the essential functions of her position and (2) modifications that enable the employee "to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities."  29 C.F.R. § 1630.2; *see also Agro Distribution*,

555 F.3d 462, 470 (5th Cir. 2009) (noting that a reasonable accommodation is one that is "sufficient to meet the job-related needs of the individual being accommodated"); EEOC Interpretive Guidance on Title I of the ADA, 29 C.F.R. pt. 1630, app., § 1630.9 [hereinafter EEOC Interpretive Guidance] ("The reasonable accommodation that is required by this part should provide the qualified individual with a disability with an equal employment opportunity."). Because the failure to reasonably accommodate an employee's disability is, by definition, a failure to provide that employee with an equal employment opportunity, the Court holds that it is unnecessary to prove a separate "adverse employment action" element in a failure to accommodate case.

The Fifth Circuit has not explicitly embraced this understanding of the duty to accommodate in a published opinion, but it has done so in an unpublished opinion. *See Bridges v. Dept. of Social Services*, 254 F.3d 71, 2001 WL 502797 at *1 (5th Cir. 2001) (unpublished) ("Although Bridges has suffered no adverse employment action, she may still raise a claim of discrimination based on the alleged failure reasonably to accommodate her disability."). The pattern jury instructions for this circuit also permit a plaintiff to prevail on a failure to accommodate claim without demonstrating that she was subject to an adverse employment action, and several courts of appeals have

adopted this approach as well.  *See* FIFTH CIRCUIT PATTERN JURY

INSTRUCTIONS: CIVIL § 11.7.2 (2006 ed.); *Rodal v. Anesthesia Group

of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004); *Stevens v.

Illinois Dept. of Transp.*, 210 F.3d 732, 736 (7th Cir. 2000).

Finally, as one commentator has noted, it is more reasonable not

to require proof of an adverse employment action, "for the

consequence of requiring a plaintiff to show a separate adverse

action would be that an employee whose request for an

accommodation is denied may not have an avenue to challenge the

decision in court without quitting the job (and later proving

constructive discharge)."  9 LEX K. LARSON, LARSON'S EMPLOYMENT

DISCRIMINATION § 156.03 (2008 ed.).  For all of these reasons, the

Court finds that Picard need not demonstrate that the Hospital

took an adverse employment action against her.

There are several components to an employer's duty to

provide reasonable accommodations.  First, an employer is under a

duty only to reasonably accommodate its employees' "*known

physical or mental limitations.*"  42 U.S.C. § 12112(b)(5)

(emphasis added).  In general, it is the employee's burden to

make her need for an accommodation known to the employer.

*Jenkins*, 487 F.3d at 315; *see also Seaman v. CSPH, Inc.*, 179 F.3d

297, 300 (5th Cir. 1999) ("[A]n employee seeking to assert a

disability discrimination claim must produce evidence that the

employer knew not only of the employee's disability, but also of

the physical or mental limitations resulting therefrom."). "When the need for an accommodation is not obvious, an employer, before providing a reasonable accommodation, may require that the individual with a disability provide documentation of the need for accommodation." *Taylor v. Principal Financial Group, Inc.*, 93 F.3d 155, 165 n.9 (5th Cir. 1996) (quoting EEOC Interpretive Guidance).

Once the employer has been put on notice of its employee's need for an accommodation, the ADA obligates both parties to engage in a good faith interactive process to develop a reasonable accommodation. *Jenkins*, 487 F.3d at 316. The EEOC has outlined a sequence of four steps that serves as a model for the interactive process:

> (1) Analyze the particular job involved and determine its purpose and essential functions;
>
> (2) Consult with the individual with a disability to ascertain the precise job-related limitations imposed by the individual's disability and how those limitations could be overcome with a reasonable accommodation;
>
> (3) In consultation with the individual to be accommodated, identify potential accommodations and assess the effectiveness each would have in enabling the individual to perform the essential functions of the position; and
>
> (4) Consider the preference of the individual to be accommodated and select and implement the accommodation that is most appropriate for both the employee and the employer.

EEOC Interpretive Guidance, § 1630.9. As with other aspects of the employer's duty to accommodate, however, the precise contours of the interactive process must be determined on a case-by-case

basis. *Loulsegad*, 178 F.3d at 736. For example, when it is
obvious what accommodation is necessary, the accommodation can be
provided without the need for further consultation between the
parties. *Id.* An employer that "demonstrates good faith efforts"
to engage in the interactive process and to make a reasonable
accommodation is shielded from liability for compensatory and
punitive damages. 42 U.S.C. § 1981a(a)(3). On the other hand,
"[w]hen an employer's unwillingness to engage in a good faith
interactive process leads to a failure to reasonably accommodate
an employee, the employer violates the ADA." *Jenkins*, 487 F.3d
at 316. But if the breakdown of the interactive process is
traceable to the employee rather than the employer, there is no
violation of the ADA. *Loulsegad*, 178 F.3d at 736.

In determining what accommodation, if any, is required, the
parties should bear in mind that employers are under a duty only
to provide *reasonable* accommodations. In general, a reasonable
accommodation is one that "provide[s] the qualified individual
with a disability with an equal employment opportunity," that is,
"an opportunity to attain the same level of performance, or to
enjoy the same level of benefits and privileges of employment, as
are available to the average similarly situated employee without
a disability." EEOC Interpretive Guidance, § 1630.9. Among
other things, reasonable accommodations may include:

> job restructuring, part-time or modified work schedules,
> reassignment to a vacant position, acquisition or

> modification of equipment or devices, appropriate adjustment
> or modifications of examinations, training materials or
> policies, the provision of qualified readers or
> interpreters, and other similar accommodations for
> individuals with disabilities.

42 U.S.C. § 12111(9)(B). The ADA does not require the employer to provide the "best" accommodation or the employee's preferred accommodation; it requires only that the employer provide an accommodation that "is sufficient to meet the job-related needs of the individual being accommodated." *Agro Distribution*, 555 F.3d at 471. When no reasonable accommodation is available, the employer is not required to make an accommodation. *See Burch v. City of Nacogdoches*, 174 F.3d 615, 620 (5th Cir. 1999).

Finally, an employer faced with a demand for reasonable accommodations may deny the request on the ground that the accommodation would create an undue hardship. Because undue hardship is an affirmative defense, *Riel*, 99 F.3d at 682, an employer seeking summary judgment on that ground has the heavy burden of establishing that every reasonable jury would find that the requested accommodation would pose an undue hardship. In addition, "[c]ourts are somewhat skeptical of hypothetical hardships that an employer thinks might be caused by an accommodation that never has been put into practice." *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 135 (1st Cir. 2004).

The Hospital puts forward several arguments in support of its request for summary judgment. First, it argues that it "had

no reason to believe that Picard actually needed to use the Dragon Speak program" because she "was always able to perform all the duties of her job." R. Doc. 34-12 at 12. The Court does not understand the Hospital to be arguing that it was not on notice of Picard's request for an accommodation. *See* R. Doc. 43 at 5 ("Defendant in no way asserts that Picard did not make a qualifying request for assistance under the ADA because she did not use magic words."). Instead, the Hospital seems to be arguing that it was never put on notice that Picard's *typing ability* was limited. *Cf. Taylor*, 93 F.3d at 164 ("[I]t is incumbent upon the ADA plaintiff to assert not only a disability, but also any limitation resulting therefrom."). There is record evidence tending to refute the Hospital's contention, however. When Picard made her various requests for permission to use the Dragon software, she cited her CMT-related typing difficulties as the justification. *See* Hooge Aff., R. Doc. 34-9 at 2; Allain Memo, R. Doc. 34-10 at 3; Gracia Aff., R. Doc. 34-11 at 3. In addition, when the Hospital responded unfavorably to her requests, she submitted two letters from her physicians specifically referring to her limited ability to type. *See* Fischer Letter, R. Doc. 39-4 at 42; Plauche Letter, R. Doc. 39-4 at 43. Thus, there is evidence that the hospital was on notice that Picard's request for the Dragon software was related to her limited typing ability.

To the extent that Picard's allegedly satisfactory job performance might have undermined her claim that her typing ability was limited, there is a genuine issue of fact that precludes summary judgment on the issue. As noted, the physicians' letters and Picard's own testimony indicate that her typing ability was in fact limited. In addition, the Hospital admits that Picard "never consistently managed to meet the productivity goal of 800 lines a day of transcription." R. Doc. 34-3 at 2. Although the Hospital points out that Picard was considered to be a good transcriptionist and was never individually disciplined for deficient typing, the important question under the ADA is not whether a disabled employee is performing satisfactorily but instead whether an accommodation is necessary to provide the employee with "an opportunity to attain the same level of performance ... as [is] available to the average similarly situated employee without a disability." EEOC Interpretive Guidance, § 1630.9. Here, there is a genuine issue of fact as to whether an accommodation would have provided Picard with such an opportunity.

Second, the Hospital argues that Picard "never submitted any medical documentation establishing that her CMT was a disability or that she needed a reasonable accommodation." *Id.* But the ADA contains no requirement that an initial request for an accommodation be accompanied by medical documentation. While the

Fifth Circuit has recognized that an employer may "require that the individual with a disability provide documentation of the need for accommodation," *Taylor,* 93 F.3d at 165 n.9, it is clear that the burden is on the employer to make it known that it needs the information. *Taylor v. Phoenixville School Dist.*, 174 F.3d 142, 160 (3d Cir. 1999) ("Once the employer knows of the disability and the employee's desire for accommodations, it makes sense to place the burden on the employer to request additional information that the employer believes it needs."); *see also Sears, Roebuck & Co.*, 417 F.3d at 804 ("[A]n employer cannot shield itself from liability by choosing not to follow up on an employee's requests for assistance, or by intentionally remaining in the dark."). In this case, there is evidence that the Hospital never requested additional documentation or explained to Picard how the letters she submitted were deficient. *See, e.g.*, Hunley Depo., R. Doc. 39-8 at 20. If Picard's medical documentation was in fact wanting, there is a genuine issue as to whether the Hospital is to blame for the deficiency.

Third, the Hospital argues that Picard's requested accommodation was unreasonable. It argues that the Dragon software would have increased the likelihood of transcription errors and would have "required reconfiguration of the transcription room." R. Doc. 34-12 at 11. Whether or not this is true, it is not an appropriate basis for granting summary

-32-

judgment in this case.  As noted above, the employee must show
only that the requested accommodation "seems reasonable on its
face" in order to satisfy her burden on summary judgment.  *U.S.*
*Airways*, 535 U.S. at 401.  There is nothing facially unreasonable
about Picard's request to have a software program installed on
her computer and to be permitted to work in quiet conditions.
Those changes are precisely the sort of accommodations that
Congress contemplated when it passed the ADA.  *See* 42 U.S.C.
§ 12111(9)(B) (listing "part-time or modified work schedules" and
"acquisition or modification of equipment or devices" as examples
of reasonable accommodations).  Once the employee has
demonstrated facial reasonableness, it becomes the employer's
burden to "show special (typically case-specific) circumstances
that demonstrate undue hardship in the particular circumstances."
*U.S. Airways*, 535 U.S. at 402; *see also* 42 U.S.C. § 12111(10)
(defining "undue hardship" as "an action requiring significant
difficulty or expense, when considered in light of" certain
enumerated factors).  The Hospital has made no attempt in its
motion to demonstrate that the Dragon software would have posed
an undue hardship, much less shown that it is entitled to
judgment as a matter of law on the issue.

Finally, the Hospital argues that it did in fact accommodate
Picard's disability.  It cites three separate accommodations that
it provided for Picard: it granted her a leave of absence for

carpal tunnel surgery, it granted her two schedule changes that she requested in order to avoid the increased traffic after Hurricane Katrina, and it conducted an ergonomic study on her work station. R. Doc. 34-12. The latter two actions have nothing to do with the relevant limitation. Picard requested the Dragon software as an accommodation for her limited ability to type. The Hospital's efforts to accommodate her traffic issues and to assess the comfort of her workstation are beside the point--there is no evidence to suggest that either modification had an effect on Picard's ability to type. And while the medical leave might have been an accommodation for Picard's limited typing ability, the duty to reasonably accommodate an individual's disability continues for as long as the limitation persists. *See Ralph v. Lucent Technologies, Inc.*, 135 F.3d 166, 172 (1st Cir. 1998) ("The duty to provide reasonable accommodation is a continuing one ... and not exhausted by one effort.") (citing *Bultemeyer v. Fort Wayne Community Sch.*, 100 F.3d 1281, 1285 (7th Cir. 1996)). Because the carpal tunnel surgery did not cure Picard's CMT or otherwise address her typing limitation, the Hospital was under a continuing obligation to reasonably accommodate Picard's disability.

In its reply brief, the Hospital advances the far more plausible argument that it reasonably accommodated Picard's disability by providing her with the Dictaphone voice recognition

-34-

software.  The Hospital correctly points out that it was under no
obligation to provide the exact accommodation requested by
Picard.  *See Agro Distribution*, 555 F.3d at 471.  Its only
obligation was to provide an accommodation that was "sufficient
to meet the job-related needs of the individual being
accommodated."  *Id*.  In this case, it is not immediately apparent
how implementing a different brand of voice recognition software
could be an unreasonable accommodation.  But the record suggests
that the way in which the Dictaphone software was implemented at
the Hospital may have largely neutralized any beneficial effects
it might have had for Picard.  The Hospital's Vice President of
Human Resources stated in her affidavit that the software was set
up such that the physicians would dictate their notes, and the
software would transcribe a rough draft.  Gracia Aff., R. Doc.
34-11 at 2.  The transcriptionists were then required to format
and edit the draft using a traditional keyboard.  *Id*.  Picard
testified that the repeated keystrokes that were necessary to use
the Dictaphone program caused her significant pain because of her
carpal tunnel surgery.  *See* Picard Depo., R. Doc. 47 at 139-40.
The Dragon software, by contrast, would have apparently allowed
Picard to transcribe and edit without the need to perform painful
keystrokes.  When Picard told Melanie Hunley about her problems
with the Dictaphone software,

> Melanie told me that since I was unable to use -- actually I
> think she said refused to use -- the finger job thing, the

-35-

> Dictaphone LP editing, that's when -- she was angry and she
> said -- that's when she said, "You will never be able to use
> Dragon Naturally Speaking." I explained to her why I could
> not use the editing system specifically, and that was when I
> asked her could I get her some information on my illness and
> could she please look at all the doctors' letters that were
> in my file from all the discussions previously with Natalie.
> And she said she didn't have any interest in reading
> anything that was in my file previous to when she came on,
> she had no interest in reading -- she actually kind of
> laughed at Dr. Plauche's letter about -- I think it might be
> this one about the Dragon Naturally Speaking.

Picard Depo., R. Doc. 47 at 165. The Hospital made no further effort to accommodate Picard's disability, and Picard resigned shortly thereafter.

It is clear from this evidence that there are genuine issues of fact as to the reasonableness of the Dictaphone software. If it is true that Picard was unable to use the Dictaphone software because it caused her great pain, it can hardly be said that the software was "sufficient to meet [Picard's] job-related needs." *Agro Distribution*, 555 F.3d at 471. In that case, once Picard informed the Hospital that the accommodation it provided was unreasonable, the Hospital would have been under an obligation to continue engaging in the interactive accommodations process. *See Humphrey v. Memorial Hosps. Ass'n*, 239 F.3d 1128, 1138 (9th Cir. 2001) ("[T]he employer's obligation to engage in the interactive process extends beyond the first attempt at accommodation and continues when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing and further accommodation is needed."). There is a

genuine issue in the current record as to whether the Hospital in fact did so.  Indeed, there is evidence that the Hospital declined to meaningfully consider Picard's accommodation request because it did not consider Picard to be disabled.  The Hospital's view of Picard's disability status may be vindicated at trial.  Until that time, however, the Hospital remains potentially liable for its failure to accommodate a known disability.

For all of the foregoing reasons, the Court finds that summary judgment must be denied on the issue of whether the Hospital failed to reasonably accommodate Picard's disability.

### ii. Retaliation

Picard's second claim is that she was retaliated against for requesting a reasonable accommodation.  *See* 42 U.S.C. § 12203. When, as here, a plaintiff seeks to prove retaliation by indirect evidence, courts analyze the claim under the three-step burden shifting analysis described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Sherrod v. American Airlines, Inc.*, 132 F.3d 1112, 1121-22 (5th Cir. 1998) (applying the *McDonnell Douglas* framework to an ADA claim).  The plaintiff may establish a *prima facie* case of unlawful retaliation by proving: (1) that she engaged in protected activity, (2) that an adverse employment action occurred, and (3) that a causal link existed between the

protected activity and the adverse employment action.  *Id.* at
1122 n.8; *see also Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d
473, 484 (5th Cir. 2008).  If the plaintiff carries her initial
burden, the employer must then put forth a legitimate,
nondiscriminatory reason for the employment action.  *Jenkins*, 487
F.3d at 317.  Finally, if the employer produces evidence of a
nondiscriminatory reason, the burden shifts back to the plaintiff
to prove that the proffered reason is pretextual.  *Id.*  Because
the Court finds that there is no evidence that an adverse
employment action was taken in this case, there is no need to
address the first and third elements of the *prima facie* case or
the second and third steps of the burden-shifting analysis.

In order to prove that an employer took an adverse
employment action of sufficient seriousness to support a charge
of retaliation, "a plaintiff must show that a reasonable employee
would have found the challenged action materially adverse, which
in this context means it well might have dissuaded a reasonable
worker from making or supporting a charge of discrimination."
*Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53,
68 (2006); *accord Aryain*, 534 F.3d at 484.  The Hospital argues
that Picard's only evidence of retaliation is her allegation that
the Hospital unreasonably denied her request to use Dragon.  The
Hospital claims that, as a matter of law, a simple denial of
reasonable accommodations does not amount to retaliation.  Picard

does not set forth specific facts in response to the Hospital's argument. Instead, she poses a question: "Did the repeated failure of the Hospital to even consider Mrs. Picard's requests for accommodations create a working condition such that a reasonable person in ... Mrs. Picard's position would have felt compelled to resign?" R. Doc. 39-1 at 14. This "question of fact" is plainly insufficient to defeat summary judgment. The Federal Rules are clear that a party opposing summary judgment "must--by affidavits or as otherwise provided in this rule--set out *specific facts* showing a genuine issue for trial." FED. R. CIV. P. 56(e)(2) (emphasis added). "Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *TIG Ins. Co. v. Sedgwick James of Washington*, 276 F.3d 754, 759 (5th Cir. 2002).

In this case, Picard has presented no evidence to show that any disciplinary or other employment action was ever taken against her. She claims that her supervisor told her that she needed to "work on [her] productivity," Picard Depo., R. Doc. 47 at 72, but verbal counseling of that sort does not come close to the showing of material adversity required to support a retaliation claim. In addition, the Hospital's alleged failure to accommodate Picard's disability appears to have affected only

her ability to meet her productivity goals.  There is no
suggestion in the record that Picard's lack of access to Dragon
caused more substantial problems that would have discouraged a
reasonable worker from requesting accommodations.  Because Picard
has presented no facts that would permit a jury to find that the
Hospital took an action that "well might have dissuaded a
reasonable worker from making or supporting a charge of
discrimination," *White*, 548 U.S. at 68, summary judgment must be
granted on her retaliation claim.


IV.  **DEFAMATION**

In addition to her ADA claims, Picard has asserted a claim
for defamation under Louisiana law.  *See* Pl.'s Compl., R. Doc. 1
at ¶ VIII.  To recover for defamation in Louisiana, a claimant
must prove five essential elements: (1) defamatory words; (2)
publication (communication to someone other than the person
defamed); (3) falsity; (4) malice, actual or implied; and (5)
injury.  *Cangelosi v. Shwegmann Brothers Giant Super Mkts.*, 390
So.2d 196, 198 (La. 1980) (citations omitted).  If one of those
elements is lacking, the cause of action fails.  *Costello v.
Hardy*, 864 So.2d 129, 140 (La. 2004) (citations omitted).  The
Hospital argues that summary judgment must be granted because
there is no evidence that it published a defamatory statement
about Picard.  Picard has not come forward with any evidence to

support her claim nor has she otherwise responded to the Hospital's argument. Summary judgment must therefore be granted for the Hospital. *See Celotex*, 477 U.S. at 324 (Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'").

## V. CONCLUSION

For the foregoing reasons, the Hospital's motion for summary judgment is GRANTED as to the retaliation and defamation claims and DENIED as to the failure to accommodate claim.

New Orleans, Louisiana, this __7th__ day of April, 2009.

_Sarah Vance_

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE